The NEW YORK CENTRAL RAILROAD
COMPANY, a corporation, Appellant,

v.

Alva O. CARR, Appellee.

No. 7519.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 19, 1957.

Decided Dec. 31, 1957.

Robert H. C. Kay, Charleston, W. Va., for appellant.

Paul J. Kaufman, Charleston, W. Va., for appellee.

Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This is an appeal from a judgment entered upon a verdict for the plaintiff in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The plaintiff was injured when he fell between two standing railway cars while attempting to repair a frozen water line. The principal question here is whether or not there was sufficient evidence of negligence on the part of the railroad to warrant submission of the case to the jury. We think there was.

The plaintiff was a cook and steward assigned to one of the railroad's construction and maintenance crews. The crew used five cars which were placed upon sidings convenient to their work. They were, in order, a flatcar upon which coal and other supplies were carried, a "cook car," a "wash car," a sleeping car and a boxcar carrying tools and supplies.

The "cook car" was a converted passenger car. The seats had been removed, and a kitchen and dining facilities had been installed. There were also two bedrooms, one for the foreman of the crew and the other for the cook. The "wash car" was a converted boxcar in which showers and other facilities had been in-

stalled. Doors had been cut at each end of the "wash car," and within the car were water storage tanks, pumps and facilities for connecting to outside sources of water and power.

A water line had been run in the "wash car" from the water storage tanks through the forward end of the car. This line terminated in an "L" shaped joint close to the top of the car and several inches inward from its left side. The water lines in the "cook car" commenced with a similar fitting near its top, left, rear corner. These two fittings could be, and usually were, connected by means of ordinary air hose joined in its middle by the air coupling so familiar in railroading. By these means water was pumped at a pressure of forty pounds from the storage tanks in the "wash car" to the faucets in the kitchen and other rooms of the "cook car."

To avoid freezing, it was customary on cold nights to cut off the water at a valve in the "wash car" and to drain the lines by disconnecting the hose coupling. This particular valve had been in a state of disrepair since the preceding winter, however, so that it would not entirely stop the flow of water. One night late in November 1955, the cold was sufficiently severe that, though the valve was closed and the hose coupling disconnected, the trickling water froze in the hose attached to the lines of the "wash car."

The next morning, the cook undertook to restore the water supply to his kitchen. He opened the leaking valve in the "wash car," and, when the pressure failed to dislodge the ice, he fashioned a crude torch of newspapers with which to apply heat to the coupling, the hose and the "L" joint. In order to do this, he leaned out of the open end of the vestibule of the "cook car," over the exposed drawbars connecting the cars,[1] and, holding on with his right hand, he stretched outward and upward, clutching the burning paper torch in his left hand. Hearing water begin to "gurgle," he stepped quickly backward to avoid onrushing water which would be directed by the coupling toward the drawbars and the open vestibule where he was standing. In doing so, he stepped on the edge of the top step of the "cook car," [2] sought to recover his balance, but pitched forward out of the open end of the vestibule and fell onto the drawbars and other fittings between the cars and then onto the tracks below.

Complaint had been made on several occasions of the leaking valve. The failure to repair or replace it necessitated the thawing operation after very cold nights, though plaintiff and other members of his crew, by closing the valve and disconnecting the hose, had done all they could to avoid freezing of the line. The thawing operation required the plaintiff to put himself in a position of such imbalance that the probability of a slip or fall should have been foreseen when he was required to move swiftly from that position to avoid the stream of water. If the valve was to remain in a state of disrepair, the railroad could have covered the open space between the standing cars, relocated the water lines so as to make the exposed portion more accessible or protected the lines from the weather. Even a reversal of the reciprocal parts of the coupling so as to direct the stream of water outwardly, rather than inwardly toward the plaintiff, would have helped. That the railroad did none of these things, the jury might reasonably have found to have been a negligent failure to provide the plaintiff with a reasonably safe place to perform his required tasks.

1. The "wash car" was not equipped with a vestibule. In passing between the two cars, the men had to step over the open space between the end of the vestibule of the "cook car" and the doorsill of the "wash car," a distance of approximately 2½ feet.

2. The vestibule doors and the covers for the steps had apparently been removed.

In their stead, hinged metal bars had been provided at the top of each flight of steps, the opposite end of which could be placed in a receiving slot so that the bar served as a guard. A similar hinged guard was provided for the open end of the vestibule. When in place it was 43½ inches above the vestibule floor.

See Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Webb v. Illinois Central Railroad Co., 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503; Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511.

The railroad points to the safety bar provided for use at the open end of the vestibule. There was testimony, however, that the thawing operation could not have been performed with this bar in place. On all prior occasions, when others as well as the cook performed this operation, this bar was not in place. The jury might also have concluded that had the bar been in place, the plaintiff would still have had to stretch over it to apply heat to the frozen hose, to withdraw suddenly to avoid the water and that, slipping and then pitching forward, he would have passed beneath the 43½ inch high bar.

Since, under the Act, the defense of assumption of risk is unavailable to the railroad and contributory negligence of an employee can go only to a diminution of the damages, our inquiry goes no further than determination that the jury might reasonably have concluded that the injury resulted in whole or in part from some negligent act or omission of the railroad. Rogers v. Missouri Pacific Railroad Co., supra.

The railroad complains that it was required to produce the written record of an interrogation of the plaintiff by one of its claim agents shortly after the injury. This examination of the plaintiff by the claim agent was conducted in the plaintiff's home when, as he testified, he was still in bed in consequence of his injury. A reporter was present who recorded, and later transcribed, the questions and answers. Plaintiff was not then represented by counsel. He was not furnished a copy of the transcript.

Some fifteen months later, as the time for trial approached, a motion was made under Rule 34 of the Federal Rules of Civil Procedure, 28 U.S.C.A., for the production of a copy of the transcript of this interview. The motion was granted, and, obedient to the order, the railroad furnished counsel for the plaintiff with a copy of the document.

When this question comes up after production of the document and a full trial on the merits, it is difficult to see what purpose, on this score, would be served by a new trial. But whatever might be done in this state of the case under other circumstances, we think the order to produce the document was well within the discretion of the District Court. We are not here confronted with the contention that a party is entitled under Rule 33, as of right, to a copy of a statement obtained by his adversary.[3] The document was requested, and its production ordered, on the basis that there was "good cause" therefor, arising out of the circumstances under which the statement was taken and the lapse of time thereafter. If fairness, alone, does not require that a cooperative employee be furnished a copy of a statement he supplies, when unrepresented by counsel and still in confinement with his injuries, the lapse of many months and the dimming of memory provides much reason for his counsel to examine any substantially contemporaneous declarations or admissions. Aside from what assistance it may be in the preparation of a case for trial, the production of such a statement, after the lapse of time, permits a more realistic appraisal of cases and should stimulate the disposition of controversies without trials. The Federal Rules of Civil Procedure were not intended to promote litigation or to hinder the means of amicable adjustment.

The order requiring the production of a copy of the plaintiff's statement was within the discretion of the District Court. Goldner v. Chicago & N. W. Ry. System, D.C.N.D.Ill., 13 F.R.D. 326; Novick v. Pennsylvania R. Co., D.C.W.D. Pa., 18 F.R.D. 296.

Finally, the railroad complains of the charge to the jury. Certain of its re-

3. Alltmont v. United States, 3 Cir., 177 F.2d 971.

quests for instructions were not given *verbatim*, but were fully covered in the Court's charge. The charge was a full and complete presentation of the governing legal principles, in which we find no error.

Affirmed.